# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **TONYA LINDSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-678-ALB-WC** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **LABOR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Tonya Lindsey is a former state bureaucrat who worked on her private real-estate business when she was supposed to be working for the taxpayers. After she was fired, she appealed to the Alabama State Personnel Board. It affirmed her termination, concluding that her conduct was "so reprehensible that if known by the general public, [it] would cause grave concern about the operation of State government." Indeed, using government resources for a private business can rise to the level of a Class B felony. *See* Ala. Code § 36-25-5; *Hubbard v. State*, No. CR-16-0012, 2018 WL 4079590, at *24 (Ala. Crim. App. Aug. 27, 2018). But Lindsey got off light—a separate government entity, the Alabama Ethics Commission, fined her $3,000 for violating the law.

Lindsey filed this employment discrimination action against the Alabama Department of Labor ("ADOL"), her former employer, alleging race and sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). (Docs. 1 and 21). This matter comes before the Court on Defendant's Motion for Summary Judgment. (Doc. 33). For the reasons stated below, the motion is due to be granted.

## BACKGROUND

### I.   Lindsey's Employment in the Benefit Payment Control Section

Lindsey, a black female, was hired by ADOL in April 2000 as an Employment Security Representative. She was first promoted in 2001 to Unemployment Compensation ("UC") Technician and was promoted again in 2012 to Unit Supervisor in the Benefit Payment Control Section ("BPC") of the UC Division. Lindsey reported to Thomas Daniel (black male), then-UC Section Supervisor of BPC, until August 16, 2014, when Daniel was promoted to UC Division Director. After Daniel's promotion, Mark Chandler (white male) became the UC Section Supervisor, and Lindsey began reporting to Chandler.

Lindsey claims that Chandler made several "inappropriate sexually charged comments" while he was her supervisor. In particular, Lindsey testified that Chandler made comments about how she would look if she were pregnant:

> [He w]ould often enter my office and make comments, some that I deemed inappropriate. And one in particular, well, several in particular,

2

> but this particular one was he would make comments about me looking
> cute pregnant. He has made comments in the past indicating certain
> employees in the area would look cute pregnant. But he specifically
> addressed me one day saying that I would look cute pregnant, as well
> as Carolyn Hollie. And I told him that I was beyond the age of having
> children so I don't know why he would make that comment. And he
> said would you want to know what I would get you for a baby shower
> gift. And I was like, what? And he said cloth diapers, clothes pins and
> a washboard. I thought that was totally inappropriate.

(Doc. 34-2 at 15). Lindsey believed Chandler's reference to clothes pins and

washboards was sexist and racist because "our ancestors, you know, used

washboards, and, you know, history, you know" and because "[n]obody use[s]

washboards anymore." (Doc. 34-2 at 18). Lindsey also claims that Chandler told her

that more women in the office should be pregnant and that her "value outweighed

[her] irritation." (Doc. 34-2 at 16-17). Finally, Lindsey claims that Chandler often

asked her to come to his office. He would discuss work-related topics but then "just

stop and stare at [her]." (Doc. 34-2 at 16). Chandler told her he stared at her for

"I.V.," *i.e.*, irritation value, but Lindsey felt like he was "undressing" her. *Id.* Other

times, Chandler would finish discussing work-related issues and keep her in his

office "for hours" discussing non-work-related issues. According to Lindsey,

Chandler was "pretty much" just shooting the breeze, and she admits that Chandler

did not say anything about her sex or race during these conversations. *Id.*

On or around September 29, 2016, Lindsey reported Chandler's comments to

Daniel, Chandler's supervisor. According to Lindsey, Daniel told her that he "knew

3

that [Chandler] could be racist but he would handle it." (Doc. 34-2 at 18). According to Daniel, he did not make this statement to Lindsey. Daniel remembers Lindsey telling him that Chandler "made remarks to her about a clothes line or clothes pins being 'old-timey' baby gifts" and that "she felt she could not satisfy his work demands," but at the time, he says that he did not understand her complaints to be complaints of race or sex discrimination. (Doc. 34-40, ¶ 40).

In any event, after Lindsey complained to Daniel, Chandler did not make any additional comments to her. About a month later, Daniel promoted Chandler to UC Call Center Manager,[1] and Lindsey began reporting to Haley Hornsby.

While supervised by Chandler, Lindsey received positive performance evaluations.[2] Chandler gave Lindsey a descriptive rating of "consistently exceeds standards" in her 2014-2015, 2015-2016, and 2016-2017 evaluations. (Doc. 34-2 at 25).

## II.    Lindsey's Transfer to the Special Programs Section

Lindsey, Hornsby, and William Wilson, who was Lindsey's direct report, were scheduled to attend a conference in Baltimore, Maryland, on December 7 and

---

[1] After Chandler was promoted to UC Call Center Manager, he was no longer in Lindsey's chain of command.

[2] After Chandler was promoted, Hornsby initially completed Lindsey's 2016-2017 performance evaluation, but both Hornsby and Lindsey agreed that Chandler was the most qualified to complete her evaluation. Thus, Chandler completed Lindsey's performance evaluation, rating her at "consistently exceeds expectations."

8, 2016. Hornsby was scheduled to make a short presentation consisting of three slides at the conference. However, Hornsby's husband passed away a few weeks before the conference, and though Hornsby initially still planned to attend the conference, her six-year-old son was showing signs of separation anxiety so she decided not to attend. Hornsby informed Carolyn Hollie, a subordinate and friend of Lindsey's, that she wanted Lindsey to give the presentation in her absence. On or around December 5, Hollie informed Lindsey that Hornsby wanted Lindsey to give the presentation. And on or around December 6—the day Lindsey left for Baltimore—Hornsby sent a text message to Lindsey with talking points for the presentation.

Lindsey refused to give the presentation. She says that she "did not feel comfortable doing it" because it was a question and answer session and she "had no knowledge of what was going on." (Doc. 34-2 at 19). After Lindsey refused, Hornsby asked Wilson to give the presentation, and he also refused. As a result, no one presented Hornsby's slides at the conference.

Hornsby was frustrated with Lindsey's refusal to give the presentation and reported this incident to Daniel, Hornsby's supervisor. According to Hornsby, this was a short, simple presentation, and Lindsey was Hornsby's direct report and a senior member of the management team. Hornsby testified that she was not

frustrated with Wilson because he was Lindsey's direct report, not hers, and was not a senior manager.

After this incident, Daniel, who believed that Lindsey and Hornsby did not get along well in general, believed that Lindsey's refusal to give the presentation "created an irreconcilable difference" between Lindsey and Hornsby. Thus, after the conference, Daniel decided to transfer Lindsey to the UC Special Programs Section. Daniel told Lindsey that she was being transferred due to a conflict,[3] and on December 20, 2016, Lindsey was transferred to the Special Programs Section and began reporting to Harriett Craig (black female), the Special Programs Section Supervisor.

## III.   <u>Lindsey's Employment in the Special Programs Section</u>

There is no dispute that Lindsey had the same position title and salary in the Special Programs Section. But Lindsey viewed her transfer as a demotion for several reasons. Lindsey claims that she was taken off the Federal Tax Information ("FTI") Committee, which had given her access to special information,[4] that she was placed

---

[3] According to Daniel, he transferred Lindsey primarily due to her refusal to give the presentation, but he considered additional factors in his decision as well, including budgetary changes, an effort to reduce "top-heavy" management in BPC, Lindsey's strong personality, and his belief that Lindsey would outperform the previous unit supervisor's performance in the Special Programs Section.

[4] Lindsey described the FTI Committee as follows: "[B]asically it was procedures, guidelines that the Department had to follow in order to secure information that they were getting from the Internal Revenue Service. And so there were extra security

in a cubicle instead of an office, and that she supervised fewer employees. (Doc. 34-2 at 28). She also claims generally that the "product and just the level of responsibilities decreased tremendously." *Id.* She also claims that the supervisor of her new division, Craig, subjected her to heightened scrutiny.

On February 6, 2017, Lindsey filed an internal grievance with ADOL's Equal Employment Opportunity ("EEO") division regarding her prior complaints about Chandler, Chandler's subsequent promotion, and her transfer. In the grievance, Lindsey mentions her September 2016 meeting with Daniel, stating that she "disclosed instances of inappropriate and racist comments made by Mr. Chandler." She further states that she "strongly believe[d] that [she] was moved as a method of retaliation by Mr. Daniel for failure to make a presentation" at the December 2016 conference in Baltimore. (Doc. 34-9 at 2).

While Lindsey's grievance was pending, Lindsey filed an EEOC Charge on March 30, 2017, alleging race and sex discrimination and retaliation under Title VII.

On May 22, 2017, EEO Manager Tonya Scott (black female), who investigated Lindsey's internal grievance, issued a Notice of Final Action, finding that Lindsey's transfer was not the result of unlawful retaliation and that Chandler's "comments and actions were, at best, inappropriate" but that Chandler had retired

---

measures taken . . . to ensure that the people—the claimant's information was secure." (Doc. 34-2 at 24).

after the investigation began and before it was concluded, "render[ing] the department unable to address any inappropriate conduct complained of in the grievance." (Doc. 34-13 at 2-3).

After Lindsey filed her 2017 grievance, Lindsey claims that Craig continued to scrutinize her, including her written work product. In July 2017, Craig met with Lindsey regarding several errors made by Lindsey. In the meeting, Craig questioned why Lindsey came to work early, why Lindsey was decorating her office if she was going to transfer to another section, and why Lindsey posted a photograph of herself on Craig's late husband's obituary. Lindsey believed that Craig was accusing her of having an affair with Craig's husband.

In August 2017, Craig met with Lindsey after one of Lindsey's subordinates reported to Craig that she felt belittled by Lindsey. Lindsey claims that she did not belittle the employee and that the employee was insubordinate, but she apologized if the employee perceived it as belittling. Though Craig instructed Lindsey to handle the employee with "kid gloves," it is undisputed that Lindsey did not receive any disciplinary action related to this incident. The same day, Lindsey told Craig that she wanted to transfer to a different section.

On September 7, 2017, Lindsey submitted a written request to Human Resource Manager Renee Minor and Secretary of Labor Fitzgerald Washington (black male) requesting a transfer to the Montgomery Call Center. In the request,

8

Lindsey described her workplace as a "hostile work environment" but did not claim that any such environment was based on her race or sex. On September 21, 2017, Lindsey met with Secretary Washington, Craig, Daniel, and Minor regarding Lindsey's transfer request. In the meeting, Craig questioned Lindsey about why she often arrived early for her shift, but according to Lindsey, Craig did not tell her to stop arriving early.

On October 2, 2017, Lindsey received a mid-year performance review, noting areas in Lindsey's performance that needed improvement. Lindsey disputed the review and submitted a rebuttal on October 4, 2017, claiming that Craig's review was retaliation for her 2017 grievance and her transfer request.

Two days later, Lindsey filed this civil action, alleging race and sex discrimination and retaliation.

## IV.   **Lindsey's Termination**

Eventually, ADOL discovered that Lindsey was using her government office to work on personal real estate deals.  Lindsey admits that she performed real estate work during her scheduled work hours. (Doc. 34-2 at 59-62).

After the September 21, 2017 meeting, Lindsey continued to arrive to work early—sometimes as early as 5:30 or 6 a.m. Yet Lindsey's shift did not begin until 7:00 a.m. Craig was curious about Lindsey's early arrival times, particularly because some parts of ADOL's information systems are not available that early. Thus, in late

November 2017, Craig searched all of her direct reports' ADOL computers and discovered that Lindsey had a large amount of personal information saved on her computer. Specifically, Lindsey had more than 884 pages of non-work-related documents stored on her computer, which included emails and other documents related to Lindsey's real estate business such as home inspections, bids on property, mortgage documents, etc.

Because Craig was concerned that Lindsey had violated several work rules, Craig consulted with Information Technology Assistant Director John Demas, who determined that Lindsey's use of her computer was not a reasonable use and stated that he had never seen so many personal documents saved to an ADOL computer.

Craig compiled Lindsey's computer files in binders for Daniel, Minor, and General Counsel Joseph Ammons. Craig had no other involvement in the investigation or termination of Lindsey.

After receiving the binders, Daniel conferred with Minor, Ammons, and Secretary Washington. On January 19, 2018, Secretary Washington sent a letter to the Alabama Ethics Commission reporting Lindsey's potential violation of the Code of Ethics related to use of official position or office for personal gain, Ala. Code § 36-25-5(c). (Doc. 34-45 at 6). A statutory ethics violation of this nature is a crime and may be punishable by incarceration. At that time, Secretary Washington began contemplating Lindsey's termination.

Also on January 19, 2018, Lindsey received her annual performance evaluation. In her review, Craig gave her a descriptive rating of "exceeds expectations," which is a good rating but lower than Lindsey's ratings in the past. On January 29, 2018, Lindsey disputed her evaluation, and two days later, Lindsey filed another internal grievance alleging retaliation.

On February 6, 2018, Lindsey met with Daniel and Minor. During the meeting, Daniel informed Lindsey that she was being placed on mandatory leave. The same day, Secretary Washington sent Lindsey a formal letter notifying her that she was being placed on mandatory leave and recommended for termination. According to the letter, Secretary Washington concurred with the recommendation to terminate Lindsey's employment because, from as early as August 2016 through December 2017, Lindsey had been using her state equipment and work time to further her real estate business and, as a result, violated the following work rules:

- State Personnel Board, General Work Rule 670-X-19-.01(1)(a)(6) (unauthorized operation of equipment);

- 670-X-19-.01(1)(a)(7) (participation in unauthorized activity or solicitations on work premises);

- 670-X-19-.01(1)(b)(10) (serious violation of any other department rule);

- 670-X-19-.01(1)(b)(13) (conduct unbecoming a state employee);

- violation of the Alabama Code of Ethics, Section 36-25-5 (use of state equipment for business benefit of the public employee);

- and violation of ADOL Employee Handbook section 4.1.4 (no employee shall engage in employment in the private sector during scheduled work hours).

(Doc. 34-28).

On February 12, 2018, Lindsey attended a pre-termination hearing where she admitted that the computer files were hers, and on February 14, 2018, Lindsey was terminated. At the time, Secretary Washington was aware of her 2017 grievance, her 2017 EEOC Charge, and her 2017 Complaint.

Lindsey appealed her termination to the Alabama State Personnel Board, stating, in part, that she "accept[ed] that what [she] did was in violation of some workplace rules" but that she had seen other employees commit worse infractions and receive only written reprimands. (Doc. 34-30). Lindsey also filed a second EEOC Charge on February 22, 2018.

On April 12, 2018, Lindsey attended a hearing before the Alabama State Personnel Board, arguing that the situation was "blown out of proportion" and that "her punishment was too severe." (Doc. 34-31 at 3). After the hearing, the Board concluded that "the Employee's conduct, and the magnitude to which she utilized State resources to further her real estate business, is so reprehensible that if known by the general public, would cause grave concern about the operation of State government. DOL cannot condone such behavior from its employees, for the good of the service." *Id.*

On August 2, 2018, the Alabama Ethics Commission fined Lindsey $3,000 for "violat[ing] the Alabama Ethics law." (Doc. 34-1 at 13-17).

## STANDARD OF REVIEW

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996). The Court views the evidence, and all reasonable inferences drawn

therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

## DISCUSSION

### I.    Discrimination Claims

Plaintiff asserts race and sex discrimination claims against Defendant under Title VII. Plaintiff's Amended Complaint is unclear as to whether she brings her claims under a hostile work environment or disparate treatment theory because Plaintiff asserts only that "Defendant's actions toward her violated her right to be free of racial [and sex] discrimination in employment." (Doc. 21, ¶¶ 25, 28). Unfortunately, Plaintiff's response to Defendant's summary judgment motion does little to clarify her claims because Plaintiff conflates the legal framework for both theories in her response. Nevertheless, assuming for the sake of argument that Plaintiff sufficiently alleged both claims, neither claim survives summary judgment.

### A.    Hostile Work Environment

To the extent Plaintiff claims that she was subjected to racial and/or sexual harassment in violation of Title VII, summary judgment is appropriate. To establish a hostile work environment claim, Plaintiff must show that (1) she belongs to a protected group, (2) that she was subjected to unwelcome harassment, (3) that the harassment was based on a protected characteristic—in this case, her race or sex, (4) that the harassment was sufficiently severe or pervasive so as to alter the terms and

conditions of her employment and create a discriminatorily abusive working environment, and (5) that Defendant is liable for the harassment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

At a minimum, Plaintiff cannot satisfy the fourth element of her sexual and/or racial harassment claims. The "severe or pervasive" element requires a plaintiff to show that the alleged conduct was both subjectively and objectively hostile or abusive. *Cheatham v. DeKalb Cnty, Ga.*, 682 F. App'x 881, 888 (11th Cir. 2017). Courts consider the totality of the circumstances to determine whether conduct rises to the level of severe or pervasive, including the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance. *Miller*, 277 F.3d at 1276.

To support her sexual harassment claim, Plaintiff alleges that Chandler (1) told her that she would "look cute pregnant"; (2) told her that he would buy her "cloth diapers, clothes pins, and a washboard" as her baby gifts; (3) told her that more women in the office should be pregnant; (4) told her that her "value outweighed [her] irritation"; (5) stared at her for "irritation value"; and (6) sometimes kept her in his office "for hours" discussing non-work-related issues.

Chandler's pregnancy-related comments and his staring were undoubtably inappropriate. They are also exceedingly weird. But they do not rise to the level of

severe or pervasive harassment based on sex. Even if Plaintiff was subjectively offended by Chandler, his comments and staring are not the type of behavior that "a reasonable person would find hostile or abusive." *Id.* For example, Chandler's comments were not physically threatening, sexually graphic, or objectively insulting. And Plaintiff has offered no evidence that Chandler's actions interfered with her job performance. *See, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII."); *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (holding that "instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated" to be objectively severe or pervasive); *Mahone v. CSX Transp., Inc.*, 652 F. App'x 820, 823-34 (11th Cir. 2016) (concluding that isolated incident where co-worker used racially-charged word was not objectively severe or pervasive).

Plaintiff's racial harassment claim fares no better. To support her racial harassment claim, Plaintiff relies on (1) Chandler's conduct identified above, (2) Daniel's statement that he knew Chandler "could be racist," and (3) secondhand information learned from another employee, James Menefee, that Chandler made some "inappropriate comments about black employees" to Menefee, though Plaintiff cannot remember what the comments were. This claim fails for at least three reasons.

16

First, Plaintiff has not demonstrated that any of Chandler's conduct identified above is related to race. Though "words not directly related to race may sometimes constitute racial harassment, there must be a surrounding context in which it is clear that a comment is 'intended as a racial insult.'" *Ambus v. AutoZoners, LLC*, 71 F. Supp. 3d 1280, 1300 (M.D. Ala. 2014). Here, Plaintiff claims that Chandler's pregnancy-related comments were racist because "our ancestors, you know, used washboards, and, you know, history, you know" and because "[n]obody use[s] washboards anymore." (Doc. 34-2 at 18). But aside from Plaintiff's own subjective belief, she has not demonstrated any basis to conclude that Chandler's comments were veiled racial insults. *See Ambus*, 71 F. Supp. 3d at 1300 (concluding that comments that plaintiff was a drug dealer and thief were not related to his race without context showing that they were intended as racial insults).

Second, even if Daniel told Plaintiff that he knew Chandler "could be racist," Daniel's comment about Chandler does not demonstrate that Plaintiff suffered from a racially hostile work environment. *See generally Woodruff v. Jackson Hosp. & Clinic, Inc.*, No. 2:18-cv-514, 2019 WL 5616906, at *5 (M.D. Ala. Oct. 30, 2019) (granting summary judgment on hostile work environment claim where plaintiff relied, in part, on supervisor's comment that she was not racist to show that her co-workers' harassment was racially motivated).

17

And finally, Plaintiff never observed Chandler make racist remarks about black employees—she learned about the remarks from another employee. None of these comments were directed at Plaintiff, nor were they made in her presence. She cannot even remember what they supposedly were. Such "through the grapevine or second-hand conduct is not sufficiently severe or pervasive so as to create a hostile work environment." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 n.9 (7th Cir. 2000); *Williams v. Ruskin Co., Reliable Div.*, No. 1:10-cv-508, 2012 WL 692964, at *14 (M.D. Ala. Mar. 1, 2012) ("[T]he fact that many of the allegations used to bolster [plaintiff's] claims are based on comments and incidents he heard second-hand though his co-workers, and were neither experienced nor witnessed directly by him, weakens the severity of his allegations."). In fact, because Plaintiff is simply reporting what someone else (Menefee) told her that Chandler said, this evidence is inadmissible hearsay and cannot even be considered. *See Macuba v. Deboer*, 139 F.3d 1316, 1323-24 & n.18 (11th Cir. 1999) (holding that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form" and approving district court's application of "reducible to admissible form at trial" standard where it "refus[ed] to consider hearsay when [the] offering party did not provide affidavit of declarant").

18

Plaintiff has failed to present substantial evidence that Chandler's harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of her employment, and her hostile work environment claims fail.

B. Disparate Treatment

Plaintiff claims that Defendant discriminated against her based on her race and sex when it (1) transferred her to the Special Programs Section and (2) terminated her employment. To be clear, these claims are distinct from Plaintiff's hostile work environment claims based on Chandler's alleged harassing conduct. Plaintiff does not allege that Chandler had any role in either her transfer or termination. In fact, Chandler retired in 2017, nearly one year before Plaintiff's termination.

Absent direct evidence, a claim for intentional discrimination is analyzed under the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335 (11th Cir. 2015). Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 1336. If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Flowers*, 803 F.3d at 1336. Once the employer meets its burden of production, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretext for

19

unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011).

To establish a *prima facie* case of race and/or sex discrimination, Plaintiff must show that (1) she was in a protected class, (2) she was qualified to perform the job, (3) she suffered an adverse employment action, and (4) other similarly-situated individuals outside of her protected class were treated more favorably. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019).

### 1. 2016 Transfer

Defendant first argues that Plaintiff cannot demonstrate a *prima facie* case of discrimination based on her transfer because the transfer was not an adverse employment action. The Court agrees.

An "adverse employment action" must "impact[] the terms, conditions, or privileges of [the plaintiff's] job in a real and demonstrable way." *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 920-21 (11th Cir. 2018). The impact "must at least have a tangible adverse effect on the plaintiff's employment." *Id.* at 921. To determine whether an employment action is "adverse," courts use an objective test: whether a reasonable person in the plaintiff's position would consider the employment action materially adverse. *Id.*; *Doe v. DeKalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998).

A lateral transfer, without more, is not an adverse employment action. *Addison v. Fla. Dep't of Corrections*, 683 F. App'x 770, 774 (11th Cir. 2017). But a transfer can be an adverse employment action if "it involves a reduction in pay, prestige[,] or responsibility." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821 (11th Cir. 2000); *see Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1302 (11th Cir. 2005) ("[T]ranfers are adverse only where the transfers were objectively equivalent, at least to some degree, to demotions."). Here, Plaintiff suffered neither a loss in pay nor a loss of title. But Plaintiff argues that her transfer constitutes an adverse employment action for four reasons: (1) she was taken off the FTI Committee, (2) she was placed in a cubicle instead of an office, (3) she supervised fewer employees, and (4) her level of responsibilities "decreased tremendously." Plaintiff's argument is unavailing.

None of the facts alleged by Plaintiff demonstrate a serious and material change in the terms and conditions of her employment. For instance, it is undisputed that Plaintiff's membership on the FTI Committee was not a requirement for any promotional opportunities and was not necessary for her to perform her job duties. *See Akins*, 420 F.3d at 1302-03 (concluding that transfer resulting in plaintiff's inability to use special certification in new position was insufficient). Further, Plaintiff eventually was provided an office and supervised at least as many direct reports as she did in the BPC. But, even if this had not happened, these kinds of

changes are not "so substantial and material" as to alter the terms and conditions of a person's employment. *See Kidd*, 731 F.3d at 1203 (recognizing that when plaintiff suffers only a loss of supervisory responsibilities, she must show the "unusual instance" where the change in responsibilities was "so substantial and material" as to alter terms and conditions of employment).

Finally, though Plaintiff claims her responsibilities decreased, she does not direct the Court to any evidence in the record supporting this assertion. In fact, her deposition testimony demonstrates that she was simply dissatisfied with her work assignments in the Special Programs Section, which is not enough to constitute an adverse employment action. *See* Doc. 34-2 at 29; *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) (finding no adverse employment action based on pharmacist's subjective evidence that her reassignment involved "decreased responsibility and prestige" and "required the performance of more menial tasks"); *Kidd*, 731 F.3d at 1204 (recognizing that workplace assignment claims "strike at the very heart of an employer's business judgment" and that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines and entity's business decisions"); *Smith v. Ala. Dep't of Public Safety*, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999) (recognizing that a lateral transfer is not an adverse employment action "anytime an employee [is] displeased with his or her transfer").

But even if Plaintiff's transfer constituted an adverse employment action, her *prima facie* case still fails because, as Defendant points out, Plaintiff has failed to offer any valid comparators. In her response brief, Plaintiff claims that William Wilson (white male) is a valid comparator because he, too, refused to give Hornsby's presentation at the conference but was not transferred.

Though Lindsey and Wilson both refused Hornsby's request regarding her presentation, a valid comparator must be "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1224 (11th Cir. 2019). And ordinarily, a valid comparator "will have engaged in the same basic conduct (or misconduct)," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

Here, Lindsey and Wilson did not share the same immediate supervisor. *See Hester v. Univ. of Ala. Birmingham Hosp.*, -- F. App'x --, 2020 WL 62143 (11th Cir. 2020) (concluding that individual was not "similarly situated" to plaintiff, in part, because plaintiff and individual did not share same immediate supervisor). Lindsey was a senior member of Hornsby's management team and reported directly to Hornsby. Wilson, however, was not a member of upper management and reported directly to Lindsey. Further, because Lindsey was a recent graduate of Certified

23

Public Manager training, Daniel believed that she was particularly equipped to handle the presentation and knew better than to refuse her direct supervisor's request. Put simply, the expectations of Lindsey as a member of upper management and as Hornsby's direct report were different than the expectations of Wilson, who was further down the chain of command. And for these reasons, Wilson is not a valid comparator, and Plaintiff's *prima facie* case of race and/or sex discrimination fails.

2.   Termination

Similarly, Plaintiff's *prima facie* case of race and/or sex discrimination based on her termination fails because she has not presented any valid comparators. Plaintiff contends that Janet Singleton (white female), Donna Giddens (white female), Mona Albright (Hispanic female), Craig Donley (white male), Kathryn McLean (white female), Patti Lee (white female), Adam Fralick (white male), Ashley Newcomb (white female), and Vanessa Watkins (black female) engaged in similar or worse conduct than Plaintiff and were not terminated. But the evidence in the record does not support Plaintiff's contention. Instead, it shows that Plaintiff and these alleged comparators were not "similarly situated in all relevant respects."

Singleton was a docket clerk in the BPC who emailed a large amount of claimants' confidential information to her personal email account in an effort to keep the information safe because she believed her ADOL computer was being sabotaged by unidentified parties. Singleton was placed on mandatory leave but not terminated

24

for this incident. Though the same decisionmakers—Daniel and Secretary Washington—were involved in Plaintiff's termination and Singleton's disciplinary action, Plaintiff and Singleton did not engage in the same basic misconduct and did not share the same employment histories. Singleton was not a supervisor, whereas Lindsey was a member of upper management. Further, Plaintiff was terminated for violation of six work rules, including a *criminal* ethics violation for which she was fined $3,000. Plaintiff has not presented any evidence that Singleton's conduct violated the same kind or number of work rules as Plaintiff. Thus, Singleton is not a valid comparator.

Giddens was a field deputy in the Tax Division who unintentionally failed to remit an employer's 2004 tax payment of $163.79. Giddens was required to repay the amount in dispute and was suspended for three days as a result of this incident. This conduct occurred more than 10 years before Plaintiff's termination, involved different decisionmakers, and, on its face, is not the same basic misconduct in which Plaintiff engaged. Thus, Giddens is not a valid comparator.

Albright was an Employment Security Representative in the Montgomery Call Center who made non-work related, long-distance telephone calls on ADOL telephones totaling 1,831.74 minutes. ADOL concedes that Albright's infraction "arguably constituted misuse of ADOL equipment," but misuse of ADOL equipment was only one of six rule violations committed by Plaintiff. (Doc. 34 at 61). Further,

Albright's infraction occurred in 2003, Albright was not a supervisor, and different decisionmakers were involved in Albright's disciplinary action. For these reasons, Albright is not a valid comparator.

Donley was a Deputy Attorney General who used ADOL's address as his home address, which ADOL concedes constitutes an ethics violation. But Lindsey used ADOL's mailing address for her personal use in addition to at least five other rules violations. Further, Donley's infraction occurred between 1998 and 2006, and neither Daniel nor Secretary Washington were his supervisors or involved in his disciplinary action. Thus, Donley is not a valid comparator.

McLean was a UC Unit Supervisor in the Special Programs Section who, according to Plaintiff, "was cited several times by ADOL for being intoxicated on the job." Plaintiff does not allege when these incidents occurred or by whom McLean was disciplined. Further, this conduct on its face is not the same basic misconduct in which Plaintiff engaged, and thus McLean is not a valid comparator.

Lee was a UC Unit Supervisor who requested a transfer from the BTQ Section to the Quality Assurance Section because she was unable to perform all of the requirements in the BTQ Section. According to Plaintiff, Lee refused to attend a BTQ training session that was required for her job. Even if this were true, Plaintiff has not demonstrated that Lee's conduct violated any work rules, much less the same work rules she violated. Plaintiff also contends that Lee called the Montgomery Call

Center while she was intoxicated and "verbally abused a call center employee." (Doc. 37 at 11). According to ADOL, Lee was issued a verbal warning in 2014 for calling the Montgomery Call Center and making disparaging comments to a call representative. Though there was speculation that Lee was intoxicated at the time, there was no proof. But again, this conduct is not the same basic conduct in which Plaintiff engaged, and neither Daniel nor Secretary Washington were involved in Lee's disciplinary action.

Fralick was a UC Specialist who, according to Plaintiff, "slapped a co-worker" as a joke. *Id.* Even if true, this conduct is patently unlike the conduct in which Plaintiff engaged. Further, Daniel nor Secretary Washington supervised Fralick at the time. In fact, Daniel was not even aware of Fralick's conduct until Fralick began reporting to Daniel in 2011. Thus, Fralick, too, is not a valid comparator.

Newcomb was a Hearings Officer in the Hearings and Appeals Division and later a UC Unit Supervisor. Plaintiff claims that Newcomb falsified records and used her state computer to work on her doctoral degree but was not terminated.[5] Plaintiff's contention is unsupported by the record. According to the uncontradicted sworn testimony submitted by ADOL, Newcomb received permission to bring a personal

---

[5] Plaintiff admitted in her deposition that she has no personal knowledge of this information.

laptop to work to work on her Master's Degree so long as her supervisors agreed and Newcomb was willing to have the laptop inspected at any time and did not connect the laptop to the ADOL network. Prior to this lawsuit, Daniel was unaware of any allegation that Newcomb used her work computer to study for an advanced degree.

Finally, Watkins is a black female and is thus not outside of Plaintiff's protected class. Further, Plaintiff has failed to demonstrate that Watkins ever engaged in her real estate business during work hours or using her work computer. Thus, Watkins, like the others, is not a valid comparator, and Plaintiff's *prima facie* case of race and/or sex discrimination fails.

But even assuming Plaintiff could demonstrate a *prima facie* case of discrimination, Plaintiff has not presented substantial evidence of pretext. That is, she has not presented evidence rebutting Defendant's legitimate, non-discriminatory reason for her termination and showing that the real reason for her termination was unlawful discrimination. In fact, Plaintiff admitted in her deposition that the hundreds of documents discovered on her work computer were her personal materials and that she used her work computer and official work address to conduct real estate transactions during work hours. In other words, it is not the conduct that Plaintiff disputes. It is the punishment. And to establish pretext, she "must do more than criticize [Defendant's] business judgment" and "quarrel with the wisdom of [its] decision." *Knight v. Fla. Dep't of Transp.*, 291 F. App'x 955, 959 (11th Cir.

2008) (citing *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)). For these reasons, summary judgment is due to be granted in favor of Defendant on Plaintiff's discrimination claims.

## II. Retaliation Claim

Plaintiff claims she suffered two discrete instances of retaliation after she complained of unlawful discrimination: (1) her 2016 transfer to the Special Programs Section and (2) her termination.[6] To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is some causal connection between the two events. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

A. <u>2016 Transfer</u>

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff engaged in protected activity when she reported Chandler's comments to Daniel on or around September 29, 2016. But Plaintiff's *prima facie* case of retaliation based on her transfer fails for two other reasons: her transfer does not

---

[6] In her response brief, Plaintiff asserts for the first time that she was denied a transfer and/or a promotion in retaliation for her complaints of unlawful discrimination. Plaintiff did not assert this claim in her EEOC Charge or her Amended Complaint, and thus the Court does not consider this claim now. Further, though Plaintiff argues that a failure to transfer "may constitute an adverse employment action," she fails to provide any evidence that this particular one does. (Doc. 37 at 18).

constitute an adverse employment action,[7] and even if it did, Plaintiff cannot show a causal connection between her complaint to Daniel and the transfer.

To establish a causal connection, Plaintiff must show that the relevant decisionmaker was "aware of the protected conduct, and that the protected activity and the adverse employment actions were not wholly unrelated." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006)). Temporal proximity alone may be enough to show that the protected activity and adverse employment actions were not "wholly unrelated," but the temporal proximity must be "very close." *Thomas*, 506 F.3d at 1364.

Here, Plaintiff attempts to establish causation based on (1) Wilson not being transferred after he refused to give Hornsby's presentation and (2) the temporal proximity between her complaint to Daniel and her transfer. As discussed in the context of Plaintiff's discrimination claims, Wilson is not a valid comparator. Further, Plaintiff complained to Daniel several months before she was transferred.

---

[7] For purposes of a retaliation claim, a "materially adverse" action is one that "might dissuade a reasonable person from pursuing a claim of discrimination." *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911-12 (11th Cir. 2013) (citing *Burlington N. & Santa Fe Ry.*, 548 U.S. 53, 68 (2006)). But for the same reasons discussed in the Court's analysis of Plaintiff's discrimination claims, Plaintiff cannot satisfy even this more relaxed standard.

This is not a close enough proximity to establish a genuine issue as to causation. *Id.*
at 1364 (stating that a three- to four-month time lapse between the protected activity
and the adverse employment action is not sufficiently close to show causation).
Because Plaintiff has not presented any other evidence of causation, her *prima facie*
case fails.

B. <u>Termination</u>

With respect to her termination, Defendant does not dispute that Plaintiff has
satisfied the first two elements of her *prima facie* case. But Defendant argues that
Plaintiff cannot show a causal connection between her complaints of discrimination
and her termination.

The parties agree that the following actions constituted protected activity: (1)
Plaintiff's February 6, 2017 internal grievance, (2) Plaintiff's March 2017 EEOC
Charge, (3) Plaintiff's October 11, 2017 Complaint, and (4) Plaintiff's January 31,
2018 internal grievance. Plaintiff first attempts to show causation based on the
temporal proximity between these complaints of discrimination and her termination.

As an initial matter, Defendant has presented undisputed evidence that
Secretary Washington was unaware of Plaintiff's January 31, 2018 grievance when
he terminated Plaintiff's employment on February 14, 2018.[8] Likewise, Daniel was

---

[8] Plaintiff claims that Secretary Washington was copied on her rebuttal to her 2018
performance evaluation, and thus he must have seen both her rebuttal and her
January 31, 2018 grievance. But Plaintiff raises no allegations of race or sex

31

unaware of this grievance when he recommended Plaintiff's termination to Secretary Washington. Thus, the three complaints about which at least one of the relevant decisionmakers was aware occurred one year, 11 months, and 4 months prior to Plaintiff's termination. Without more, none of these complaints have a close enough proximity to Plaintiff's termination to establish causation.

Plaintiff also claims that her receipt of increased scrutiny by Craig, including Craig's search of Plaintiff's work computer, after she complained of discrimination is additional evidence of causation. But the problem with Plaintiff's argument is that Craig's increased scrutiny of Plaintiff demonstrates, at best, that Craig harbored some kind of retaliatory animus against Plaintiff. It does not demonstrate that any of the relevant decisionmakers—Secretary Washington or Daniel—harbored a retaliatory animus against Plaintiff. Indeed, Plaintiff has not presented any evidence suggesting that Secretary Washington or Daniel had a retaliatory motive, nor has she shown that Craig's alleged retaliatory animus had a determinative influence on Washington's decision to terminate her.

To be sure, even if Craig had a retaliatory animus against Plaintiff, it is undisputed that Craig was not involved in ADOL's investigation of Lindsey after she provided the binders containing Lindsey's computer files to Daniel, Minor, and

_____

discrimination in her rebuttal, and the fact that Secretary Washington was copied on the rebuttal has no bearing on his knowledge of Plaintiff's grievance, which was a separate document. *See* Doc. 37-11.

Ammons on January 11, 2018. After Daniel's review of the computer files, which contained nearly 900 pages of non-work-related materials, he conferred with Minor, Ammons, and Secretary Washington regarding Lindsey's multiple work rule violations, including an ethics violation. Ultimately, based on his review of the files, Daniel recommended to Secretary Washington that Lindsey be terminated. Secretary Washington was "astounded at the volume of realtor-related materials on [Lindsey's] computer and the emails related to her realtor work that she sent during work hours, using her work computer and email address." (Doc. 34-45, ¶ 6). In addition, "based on the hundreds of pages of real estate exam study materials" on Lindsey's work computer, Secretary Washington believed that Lindsey "had also spent ADOL working hours studying for her real estate license." *Id.* Thus, "[b]ased on the overwhelming evidence and the clear violations of Departmental and state rules and policies," Secretary Washington agreed with the decision to terminate Lindsey's employment. *Id.*; *see Burns v. Alabama Power Co.*, No. 6:15-cv-2332, 2017 WL 1491304, at *6-7 (N.D. Ala. Apr. 25, 2017) (granting summary judgment in favor of defendant on retaliation claim where plaintiff failed to show that individual who initiated investigation and had alleged retaliatory animus had a "determinative influence" on the decisionmakers).

Because Plaintiff does not offer any other evidence to show causation, her *prima facie* case fails.

But even assuming Plaintiff could establish a *prima facie* case, her retaliation claim still fails because, as discussed in the context of her discrimination claims, she has not presented substantial evidence rebutting Defendant's proffered reasons for her termination from which a jury could conclude that Defendant's reasons were pretext for unlawful retaliation. Plaintiff has not identified any valid comparators. And even if Plaintiff is correct that Craig's search of her direct reports' computers "was targeted specifically against [Plaintiff]," (Doc. 37 at 22), it does not change the fact that Plaintiff admittedly violated the work rules for which she was terminated and that Plaintiff failed to present any evidence that the decisionmakers had a retaliatory animus. Thus, summary judgment is due to be granted in favor of Defendant on Plaintiff's retaliation claim.

## CONCLUSION

Based on the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 33) is due to be **GRANTED**.

A final judgment will be entered separately.

**DONE** and **ORDERED** this 11th day of February 2020.

_____/s/ Andrew L. Brasher_____
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE